Rosemary B. O'BRIEN, etc., Plaintiff,

v.

GRUMMAN CORPORATION and Grumman Aerospace Corporation, Defendants.

Rosemary B. O'BRIEN, etc., Plaintiff,

v.

INTERNATIONAL BUSINESS MACHINES CORPORATION, Defendant.

INTERNATIONAL BUSINESS MACHINES CORPORATION, Plaintiff,

v.

GRUMMAN AMERICAN AVIATION CORPORATION, Defendant.

Angela W. MURPHY, etc., Plaintiff,

v.

GRUMMAN AMERICAN AVIATION CORPORATION, Defendant and Third-Party Plaintiff,

v.

INTERNATIONAL BUSINESS MACHINES CORPORATION and Mary Louise Whitman, etc., Third-Party Defendants.

Mary Louise WHITMAN, etc., Plaintiff,

v.

GRUMMAN AMERICAN AVIATION CORPORATION, Defendant and Third-Party Plaintiff,

v.

INTERNATIONAL BUSINESS MACHINES CORPORATION and Angela W. Murphy, etc., Third-Party Defendants.

Nos. 76 Civ. 988 (HFW), 76 Civ. 3575 (HFW), 77 Civ. 1146 (HFW), 75 Civ. 3026 (HFW) and 75 Civ. 3027 (HFW).

United States District Court, S. D. New York.

July 3, 1979.

Geoghan, Tutrone & Grossman, New York City, for Murphy; Marc E. Grossman, New York City, of counsel.

Kreindler & Kreindler, New York City, for Whitman; Milton G. Sincoff, Steven Earl Anderson, New York City, of counsel.

Troutman, Sanders, Lockerman & Ashmore, Atlanta, Ga., Grossman, Neidoff, Ribando & Weinbaum, Brooklyn, N. Y., for O'Brien; Robert L. Pennington, Steven W. Korn; Atlanta, Ga., Samuel Weinbaum, Brooklyn, N. Y., of counsel.

Bigham, Englar, Jones & Houston, New York City, for IBM; John J. Martin, New York City, of counsel.

Haight, Gardner, Poor & Havens, New York City, for Grumman Corp., Grumman Aerospace and Grumman American; Walter E. Rutherford, Robert B. Haserot, New York City, of counsel.

## OPINION

WERKER, District Judge.

These five actions arising from an airplane crash are presently before the Court

on various motions and cross-motions for summary judgment and consolidation.

## FACTS

The following facts are not in dispute.

On June 24, 1974, Grumman Gulfstream II aircraft no. N72OQ crashed in the vicinity of Kline, South Carolina. All three persons aboard the aircraft, Thomas W. O'Brien, Paul F. Whitman and James M. Murphy, were killed as a result. O'Brien was an instructor pilot employed by Grumman American Aviation Corporation ("Grumman American") and Whitman and Murphy were pilots employed by International Business Machines Corporation ("IBM"). O'Brien was aboard the plane to provide Whitman with flight instruction, and Murphy accompanied them as an observer.

Aircraft no. N72OQ was the 58th plane in the Gulfstream II series. It was manufactured and assembled in Georgia pursuant to a design initially drafted in New York. The first 23 planes in the Gulfstream II series were manufactured in New York before Grumman Aircraft Engineering Corporation ("Grumman Aircraft") changed its manufacturing site to Georgia in 1968. Grumman Aircraft changed its corporate name to Grumman Corporation ("Grumman Corp.") on July 23, 1969, three weeks after it had transferred all of its aerospace business, including the Gulfstream II assets and liabilities, to Grumman Aerospace Corporation ("Grumman Aerospace"), its wholly-owned subsidiary. Responsibility for the Gulfstream II program was shifted once again in 1973, when Grumman Aerospace transferred all of its Gulfstream assets and liabilities to Grumman American in exchange for some of the latter's stock. From 1973 until 1978, approximately 81% of Grumman American was owned by Grumman Corp. and/or Grumman Aerospace, and approximately 19% by AJI-Ohio Corp., an Ohio corporation.

Aircraft no. N72OQ was sold by Grumman Aircraft to IBM pursuant to a written contract executed in New York on September 27, 1966. The airplane was delivered to IBM in Savannah on June 10, 1969. Thereafter, the plane was operated from and maintained at IBM's facility at the Dutchess County Airport in Wappingers Falls, New York.

In 1970, Grumman Aerospace requested the British Air Registration Board (the "ARB") to evaluate its Gulfstream II aircraft to enable it to seek certification for sale in the United Kingdom. The ARB conducted an evaluation at Grumman Aerospace's facility at Bethpage, New York and issued a report on June 24, 1970 criticizing various aspects of the Grumman II ground spoiler system and design. As a result of the ARB report, Grumman Aerospace conducted its own study and concluded that certain modifications would cure the problems detected by the ARB. This study was prepared by Grumman Aerospace in New York and was issued on August 12, 1970.

The design changes suggested by the Grumman Aerospace report were embodied in Grumman Gulfstream II Aircraft Service Change no. 98, which was issued by Grumman Aerospace on August 20, 1971 in Georgia. The service change was circulated among the owners of Gulfstream II aircraft to be implemented at their option. IBM opted not to modify aircraft no. N72OQ.

In June 1974, prior to the accident, aircraft no. N72OQ was flown from New York to Georgia and Whitman and Murphy, who were New York residents, travelled from New York to Georgia to participate in the training flight. On June 24th, the aircraft departed from Grumman American's facilities at the Savannah municipal airport at approximately 3:20 p. m. The plane was scheduled to return to Savannah, but crashed near Kline, South Carolina at approximately 4:45 p. m.

The instant five lawsuits were filed as follows:

In action no. 75 Civ. 3026, Mrs. Whitman, as executrix of the Whitman estate, seeks wrongful death and survival damages from Grumman American on the grounds of negligence, strict liability in tort and breach of warranty. Grumman American has im-

pleaded IBM and Mrs. Murphy, as administratrix of the Murphy estate, as third-party defendants. Mrs. Whitman was a New York resident both at the time of the accident and of the filing of this lawsuit and was appointed executrix of the Whitman estate by a New York court. After this action was commenced, Mrs. Whitman moved to Texas. Grumman American is an Ohio corporation with its principal place of business in Georgia. IBM is a New York corporation with its principal place of business in New York.

In action no. 75 Civ. 3027, Mrs. Murphy, as the administratrix of the Murphy estate, seeks wrongful death and survival damages from Grumman American on the grounds of negligence, strict liability in tort and breach of warranty. Grumman American has impleaded IBM and Mrs. Whitman as executrix of the Whitman estate. Mrs. Murphy was a New York resident both at the time of the accident and of the filing of this action and was appointed administratrix by a New York court. Mrs. Murphy moved to North Carolina some time after this suit was instituted.

Action no. 76 Civ. 988 is a suit brought by Mrs. O'Brien individually and as executrix of the O'Brien estate against Grumman Corp. and Grumman Aerospace for wrongful death and survival damages on negligence, strict liability in tort and breach of warranty grounds. Mrs. O'Brien was and has been since 1968 a resident of Georgia and was appointed executrix of the O'Brien estate by a Georgia court. The O'Briens were New York residents until 1968, when Mr. O'Brien was transferred to Georgia in the course of his employment with the Grumman companies. Grumman Corp. and Grumman Aerospace are and were at all relevant times New York corporations with their principal places of business in New York.

Action no. 76 Civ. 3575 was commenced by Mrs. O'Brien against IBM for wrongful death and survival damages on the grounds that IBM owned and negligently maintained aircraft no. N72OQ.

Action no. 77 Civ. 1146 involves a claim by IBM against Grumman American for loss of the airplane on theories of negligence and strict liability in tort.

In *IBM v. Grumman American*, Grumman American moves for summary judgment, alleging that IBM's claims for property loss are barred by a contractual exculpatory clause. In *O'Brien v. Grumman*, the parties have cross-moved for summary judgment with respect to the Grumman defendants' contention that Mrs. O'Brien's claims are barred by the Georgia workmen's compensation statute. In the *Whitman, Murphy* and *O'Brien v. Grumman* cases, the Grumman defendants move for partial summary judgment on the wrongful death claims premised on strict liability and breach of warranty, alleging that these claims are barred by the Georgia wrongful death statute. Additionally, the parties have filed various motions and cross-motions for consolidation.

## DISCUSSION

### A. *The Warranties Disclaimer Defense*

IBM's action against Grumman American for the loss of the aircraft is based on theories of strict liability in tort and negligence. In moving for summary judgment, Grumman American alleges that IBM is barred from proceeding on either of these theories by virtue of a disclaimer provision in the contract of sale.

Article IX(f) of the contract provides:

### ARTICLE IX–*WARRANTIES*

. . . . .

(f) THE WARRANTY SET FORTH IN THIS ARTICLE IS EXCLUSIVE AND IN LIEU OF ALL OTHER WARRANTIES AND REPRESENTATIONS, EXPRESS, IMPLIED OR STATUTORY, INCLUDING BUT NOT LIMITED TO THE IMPLIED WARRANTIES OF MERCHANTABILITY AND FITNESS. This warranty is also in lieu of all other obligations and warranties (including without limitation the implied warranties of merchantability and fitness) related to

any modifications, repairs, replacement parts or service change kits which may hereafter be furnished by Grumman to Buyer for use on the aircraft either pursuant to this warranty clause or otherwise. Except for the obligations expressly undertaken by Grumman in this article, Buyer hereby waives and releases all rights, claims and remedies with respect to any and all warranties, express, implied or statutory (including without limitation, the implied warranties of merchantability and fitness), duties, obligations and liabilities arising by law or otherwise and including, but without being limited to, any obligation of Grumman with respect to incidental or consequential damages or damages for loss of use. No agreement or understanding varying or extending this warranty will be binding upon Grumman unless in writing, signed by a duly authorized officer or representative of Grumman.

Pursuant to article XIV(c) the contract is to be construed in accordance with New York law.[1] See U.C.C. § 1–105(1).

Grumman's present motion for summary judgment is its third such motion. The first two motions[2] were denied to permit the taking of testimony on the issue of the intended scope of the warranties disclaimer provision. The individuals who negotiated the contract were subsequently deposed and their depositions have been furnished to the Court. These depositions do not, however, provide any elucidation, for the negotiators of the contract apparently did not discuss the issue of whether article IX(f) encompassed claims arising from strict liability in tort or negligence. See dep. of Myra Schubin, June 27, 1978, at 14, 22–23; dep. of John F. Carr, June 27, 1978, at 30–31. The parties have not been able to adduce any other extrinsic evidence to aid in interpreting article IX(f) of the contract.[3] Since no real negotiations were had, and in light of the substantial amount of time which has elapsed since the contract was drafted and signed, the lack of evidence is not surprising. Because of this lack of extrinsic evidence, however, no question of fact has sufficiently been raised.[4] I therefore conclude that the meaning of article IX(f) is an issue of law for the Court to resolve.

IBM's strict liability in tort cause of action is in my opinion barred by the warranties disclaimer provision contained in article IX(f). While the law of New York today characterizes such an action as one sounding in tort rather than contract, *Martin v. Julius Dierck Equipment Co.*, 43 N.Y.2d 583, 589, 403 N.Y.S.2d 185, 188, 374 N.E.2d 97, 100 (1978), this has not always been the case. At the time the contract was executed, it was generally agreed that "strict liability in tort and implied warranty in the absence of privity are merely different ways of describing the very same cause of action." *Mendel v. Pittsburgh Plate Glass Co.*, 25 N.Y.2d 340, 345, 305 N.Y.S.2d 490, 494, 253 N.E.2d 207, 210 (1969), *overruled, Victorson v. Bock Laundry Machine Co.*, 37 N.Y.2d 395, 373 N.Y.S.2d 39, 335 N.E.2d 275 (1975). The strict products liability cause of action developed over the years as courts endeavored to circumvent the "citadel of privity" which precluded consumers from proceeding on a breach of

---

1. Neither side has argued otherwise.

2. The first summary judgment motion was denied by Judge Goettel in September 1977. Thereafter, Judge Goettel disqualified himself from the case and the matter was ultimately transferred to me. Grumman American then filed a second summary judgment motion in the form of a motion to vacate or reconsider Judge Goettel's September 1977 decision. This motion was denied in a memorandum decision dated October 26, 1977.

3. The parties have presented after-the-fact, subjective opinions as to the meaning of the warranties disclaimer provision. These opinions are not relevant to the intent of the parties at the time they entered into the contract.

4. The case law provides that ambiguous contracts are to be interpreted by a jury where extrinsic evidence will assist in their construction. *See Heyman v. Commerce & Indus. Ins. Co.*, 524 F.2d 1317, 1320 (2d Cir. 1975). In the suit at bar, no such extrinsic evidence exists. Consequently, all that remains is a question of contract interpretation limited to the four corners of the contract. *See generally Meyers v. Selznick Co.*, 373 F.2d 218 (2d Cir. 1966).

warranty theory in the absence of privity. Prior to the "weakening of the walls of the citadel," plaintiffs not in privity with a manufacturer could recover for injuries caused by defective products only if they could prove negligence. *See generally* Prosser, *The Assault Upon the Citadel*, 69 Yale L.J. 1099 (1960); *Martin v. Julius Dierck Equipment Co.*, 43 N.Y.2d at 593, 403 N.Y.S.2d at 190, 374 N.E.2d at 102 (Gabrielli, J., dissenting and concurring). In the instant case, IBM and Grumman American are in privity of contract. Hence, from their point of view, at the time of the execution of the contract of sale, a claim for strict liability in tort was the equivalent of a claim for breach of implied warranty.[5] It is clear, then, that IBM and Grumman American intended to include within the scope of the warranties disclaimer provision any claim for strict liability in tort. Since IBM waived "all rights, claims and remedies with respect to any and all warranties, express, implied or statutory . . . ." except as otherwise provided in article IX of the contract of sale, IBM's first cause of action must be dismissed.[6] *See Velez v. Craine & Clark Lumber Corp.*, 33 N.Y.2d 117, 124–25, 350 N.Y.S.2d 617, 623, 305 N.E.2d 750, 754 (1973) ("[W]e see no reason why in the absence of some consideration of public policy parties cannot by contract restrict or modify [strict liability in tort]."); *DeCrosta v. A. Reynolds Construction & Supply Corp.*, 49 A.D.2d 476, 480–81, 375 N.Y.S.2d 655, 658–59 (3d Dep't 1975), *aff'd on other grounds*, 41 N.Y.2d 1100, 396 N.Y. S.2d 357, 364 N.E.2d 1129 (1977). *See also* U.C.C. § 2–316(3) ("[U]nless the circumstances indicate otherwise, all implied warranties are excluded by . . . language which in common understanding calls the buyer's attention to the exclusion of war-

ranties and makes plain that there is no implied warranty . . . .").

IBM's second cause of action poses a more difficult issue. Grumman American contends that IBM's negligence claim is barred by the language in the warranties disclaimer clause providing that IBM "waives and releases all rights, claims and remedies with respect to any and all warranties, . . . duties, obligations and liabilities arising by law or otherwise . . . ." Despite the absence of any reference to negligence or other tortious conduct, Grumman American argues that the quoted language is broad enough to bar any claims for negligence. I disagree.

It is settled in New York that an exculpatory clause in a contract intended to insulate one of the parties from liability for his own negligence is enforceable, absent certain limited public policy considerations. *Ciofalo v. Vic Tanney Gyms, Inc.*, 10 N.Y.2d 294, 220 N.Y.S.2d 962, 177 N.E.2d 925 (1961). While such an exculpatory clause need not explicitly refer to negligence, *Levine v. Shell Oil Co.*, 28 N.Y.2d 205, 321 N.Y.S.2d 81, 269 N.E.2d 799 (1971), the intention to contract away liability for one's own negligence must be set forth in specific and unequivocal terms. *Hogeland v. Sibley, Lindsay & Curr Co.*, 42 N.Y.2d 153, 158–59, 397 N.Y.S.2d 602, 606, 366 N.E.2d 263, 266 (1977).[7] The contract, taken in its entirety, must unambiguously give rise to the conclusion that the "unmistakable intent" is to absolve one of the parties of liability for his own negligence. *Levine v. Shell Oil Co.*, 28 N.Y.2d at 212, 321 N.Y.S.2d at 86, 269 N.E.2d at 803. *See generally Martin v. Maintenance Co.*, 588 F.2d 355, 358–59 (2d Cir. 1978) (*per curiam*).

---

5. Whether a plaintiff in privity with a defendant manufacturer still has a cause of action in strict liability in tort is open to question. *See Martin v. Julius Dierck Equip. Co.*, 43 N.Y.2d at 593, 403 N.Y.S.2d at 191, 374 N.E.2d at 102 (Gabrielli, J., dissenting and concurring).

6. The Court notes that IBM has not even attempted to oppose Grumman American's motion as to the strict products liability claim.

7. In *Willard Van Dyke Prods., Inc. v. Eastman Kodak Co.*, 12 N.Y.2d 301, 304, 239 N.Y.S.2d 337, 339, 189 N.E.2d 693, 694 (1963), the New York Court of Appeals observed: "The law looks with disfavor upon attempts of a party to avoid liability for his own fault and, although it is permissible in many cases to contract one's self out of liability for negligence, the courts insist that it must be absolutely clear that such was the understanding of the parties."

The language relied on by Grumman American in the case at bar is concededly very broad. Nevertheless, I cannot conclude that the "unmistakable intent" of the parties was to relieve Grumman American of liability for its own negligence. When the language relied on by Grumman American is placed in the context of the entire agreement, it is apparent the parties did not contemplate including negligence liability in the disclaimer clause.

The waiver language appears in paragraph (f) of article IX, which is specifically entitled "WARRANTIES." Article IX sets forth the warranties given by Grumman American and outlines the limitations and conditions imposed on these warranties. The article focuses solely on Grumman American's warranties, and does not address any other matter.

In providing for the waiver and release of all rights and remedies arising from "any and all warranties, . . . duties, obligations and liabilities," paragraph (f) specifically refers to "incidental or consequential damages or damages for loss of use," damages which are traditionally contractual in nature. *See* U.C.C. § 2–715. No mention is made of "compensatory or punitive damages."

The contract is not completely devoid of reference to negligence or other tortious conduct. Paragraph (d) of article IX provides that Grumman American's warranties do not apply "to any defect in the aircraft or parts thereof which is the proximate result of an accident, misuse, neglect, improper installation, improper repair, or improper modification by persons other than Grumman, its agents or employees . . ." Similarly, article X absolves Grumman of liability for failure or delay in the performance of the terms and conditions of the contract when "such failure or delay is due to causes beyond the reasonable control of Grumman and without its fault or negligence . . . ." Hence, the inference can certainly be drawn that had IBM and Grumman American intended to include negligence liability within the scope of the warranties disclaimer clause, they would have done so explicitly.

The cases cited by Grumman American on this issue are distinguishable in that they concerned indemnity or exculpatory clauses which either expressly mentioned negligence or which were primarily concerned with liability for personal injury. *E. g., Martin v. Maintenance Co.,* 588 F.2d at 358; *Margolin v. New York Life Insurance Co.,* 32 N.Y.2d 149, 153, 344 N.Y.S.2d 336, 339, 297 N.E.2d 80, 83 (1973); *Levine v. Shell Oil Co.,* 28 N.Y.2d at 212–13, 321 N.Y.S.2d at 86, 269 N.E.2d at 801; *Kurek v. Port Chester Housing Authority,* 18 N.Y.2d 450, 456–57, 276 N.Y.S.2d 612, 615, 223 N.E.2d 25, 28 (1966); *Liff v. Consolidated Edison Co.,* 29 A.D.2d 665, 286 N.Y.S.2d 354, 355 (2d Dep't 1968), *aff'd,* 23 N.Y.2d 854, 298 N.Y.S.2d 66; 245 N.E.2d 800 (1969); *Porter v. Avlis Contracting Corp.,* 86 Misc.2d 235, 239, 381 N.Y.S.2d 595, 598 (Sup.Ct. Nassau Co.1976), *modified,* 57 A.D.2d 222, 394 N.Y.S.2d 226 (2d Dep't 1977). Excluding negligence claims from the indemnity or exculpatory clauses in these cases would have rendered the clauses meaningless, a result the parties certainly did not intend. At issue in the instant action, however, is a contract for the sale of property. Liability for personal injuries arising from use of the plane is covered in a separate indemnity clause in the contract. A finding that the warranties disclaimer clause does not bar a claim for loss of the aircraft resulting from Grumman American's alleged negligence does not render the warranties disclaimer clause a nullity, for all of its provisions remain in effect as to liability for breach of warranty.

Accordingly, Grumman American's motion for summary judgment is granted as to the strict liability in tort claim and denied as to the negligence claim. IBM's first cause of action is dismissed.

### B. *The Workmen's Compensation Defense*

In their answer to the complaint in *O'Brien v. Grumman Corp.,* Grumman Corp. and Grumman Aerospace asserted the defense that "[p]laintiff's exclusive remedy for the injuries and death alleged in the complaint is pursuant to the applicable Workmen's Compensation Statute, and un-

der said Statute the claims alleged herein are barred as against the defendants." Both sides move for summary judgment on this issue.

Plaintiff's deceased commenced employment with Grumman Corp. (then known as Grumman Aircraft Engineering Corp.) in New York in 1967. He was relocated to Georgia in 1968. At that time Grumman Corp. was responsible for the design and manufacture of the Gulfstream II aircraft. As the Grumman conglomerate underwent reorganization, this responsibility was transferred first to Grumman Aerospace in 1969 and then to Grumman American in 1973. Since Mr. O'Brien was employed in connection with the Gulfstream II program, he was employed by Grumman Corp. until 1969, by Grumman Aerospace from 1969 until 1973, and by Grumman American from 1973 until his death in 1974. After her husband's death, Mrs. O'Brien applied for and was awarded workmen's compensation benefits from Grumman American pursuant to the Georgia worker's compensation statute.

Mrs. O'Brien avoided suing Grumman American and commenced this suit against Grumman Corp. and Grumman Aerospace. She presently contends that her suit is not barred by Georgia's workmen's compensation statute since that statute only bars an employee (or his estate) from suing his employer. Consequently, she maintains, she is not precluded from suing the parent or a sibling corporation of her deceased husband's former employer. The defendants, on the other hand, allege that plaintiff's deceased "should be regarded as being employed by the Gulfstream II program as an entity whose components, Grumman [Corp.], Grumman Aerospace and Grumman American, all stand on equal footing as his

'Employer.'" Defendants Mem. of Law in Support of Summary Judgment, at 10. The defendants note that plaintiff's deceased, throughout his employment, was covered under a single workmen's compensation policy which had been obtained by Grumman Corp. and which included in its coverage both Grumman Aerospace and Grumman American.

■ Since this action involves a situation where the plaintiff received an award pursuant to the Georgia worker's compensation scheme, under which the defendants were required to provide compensation insurance, the issue of whether the defendants are immune from liability by virtue of the workmen's compensation statute is an issue to be determined under Georgia law. Restatement (Second) of Conflict of Laws § 184 (1971).[8] Although the Georgia courts have not yet had an opportunity to address the issue,[9] I am of the opinion that a Georgia court would hold that an employee of a wholly-owned subsidiary corporation is not barred by the Georgia worker's compensation statute from suing the subsidiary's parent or sibling corporation.

■ The Georgia worker's compensation scheme permits an employee (or his survivors) to sue third party tortfeasors even though the employee has been granted a compensation award from his employer. *Athens Railway & Electric Co. v. Kinney,* 160 Ga. 1, 6, 127 S.E. 290, 292 (1924); *Scott v. Crescent Tool Co.,* 296 F.Supp. 158, 160 (N.D.Ga.1969). *See* Ga.Code Ann. § 114–103 (Supp.1978). In the instant case, notwithstanding the fact that Grumman Corp. and Grumman Aerospace are part owners of Grumman American, it is undisputed that they are three separate and distinct corporations. Although it is correct that Grumman American was "controlled" by

8. Comment b to section 184 of the Restatement (Second) of Conflict of Laws provides in part: "[A] defendant will be accorded immunity from tort or wrongful death liability if he is given such immunity by the workmen's compensation statute of any state under which he is required to provide insurance against the particular risk and under which the plaintiff has already obtained an award for the injury."

Because I conclude that New York and Georgia are in accord on this issue, there is no genuine conflict of laws.

9. The Georgia workers' compensation statute also fails to shed any light in the matter. Ga. Code Ann. § 114–101 (Supp.1978) broadly defines "employer" as "any individual, firm, association or corporation engaged in any business, except as hereinafter provided . . . .."

the other two companies to the extent that they owned some 81% of its stock, the fact remains that Mr. O'Brien was employed and paid by Grumman American and not by Grumman Corp. or Grumman Aerospace or some other nebulous "economic entity." Affid. of Walter E. Rutherford, sworn to May 18, 1979, at 5–6. As an employee of Grumman American, it must be presumed that Mr. O'Brien was controlled by that entity and none other. Additionally, the plaintiff's claims are premised on independent, allegedly tortious acts of Grumman Corp. and Grumman Aerospace, and not on any derivative theory of liability based on their relationship to Grumman American. Hence, Grumman Corp. and Grumman Aerospace must be considered to be third party tortfeasors.

The majority of the courts which have confronted the question have held that parent and subsidiary corporations must be treated as separate and distinct entities for purposes of workmen's compensation statutes. *E. g., Boggs v. Blue Diamond Coal Co.,* 590 F.2d 655, 663 (6th Cir. 1979) ("[U]nder Kentucky's Workmen's Compensation Act a parent is not immune from tort liability to its subsidiary employees for its own, independent acts of negligence"); *Latham v. Technar, Inc.,* 390 F.Supp. 1031 (E.D.Tenn.1974); *Thomas v. Hycon, Inc.,* 244 F.Supp. 151 (D.D.C.1965) (applying Maryland law); *Thomas v. Maigo Corp.,* 37 A.D.2d 754, 323 N.Y.S.2d 106 (4th Dep't 1971) (held, for purposes of New York workmen's compensation statute, wholly-owned subsidiaries are separate and distinct legal entities and cannot be considered "employees" of parent corporation); *Daisernia v. Co-operative G.L.F. Holding Corp.,* 26 A.D.2d 594, 270 N.Y.S.2d 542 (3d Dep't

1966); *Phillips v. Stowe Mills, Inc.,* 5 N.C. App. 150, 167 S.E.2d 817 (1969); *Brown v. Moorhead Oil Co.,* 239 S.C. 604, 124 S.E.2d 47 (1962).[10] The Court has discovered only one case holding otherwise. In *Goldberg v. Context Industries, Inc.,* 362 So.2d 974 (Dist.Ct.App.Fla.1978), in a brief *per curiam* opinion without citation to any precedent or authority, the Florida District Court of Appeal for the Third District affirmed the trial court's ruling that an employee who had collected a workmen's compensation award from a subsidiary corporation was barred from suing the subsidiary's parent corporation, where both corporations appeared as joint insureds on a single workmen's compensation insurance policy.[11]

In the instant case, there is no reason to disregard the corporate structures. *See Trans-Amazonica Iquitos, S.A. v. Georgia Steamship Co.,* 335 F.Supp. 935, 937 n.1 (S.D.Ga.1971). There are no allegations that Grumman American is a mere agent or instrumentality of Grumman Corp. or Grumman Aerospace. Indeed, Grumman American is not even a wholly-owned subsidiary, for some 19% of its shares are held by an unrelated Ohio corporation. The fact that the three Grumman companies were covered under the same workmen's compensation insurance policy has little if any relevance, for Mr. O'Brien would have looked—as his survivors did—to Grumman American for compensation. The fact that Mr. O'Brien formerly worked for Grumman Corp. and Grumman Aerospace is similarly insignificant, since his death arose in the course of his employment with Grumman American and Grumman American alone. At the time of the accident, Mr. O'Brien was not "in the service of [Grumman Corp. or Grumman Aerospace] under any contract

10. *Compare Vaughn v. Jernigan,* 144 Ga.App. 745, 242 S.E.2d 482 (1978) (employee of corporate employer could not sue corporation's officer where the employee had received workers' compensation award from the corporation, since the officer was acting as the corporation's "alter ego" in a representative capacity).

11. Hence, plaintiff's observation that "every court that has considered the issue . . . recognizes that parent and subsidiary corporations must be considered as separate entities

under the workmen's compensation laws" is incorrect. Plaintiff's Brief in Opp. to Defendants' Motions for Summary Judgment, at 14. It should also be noted that the defendants failed to cite the *Goldberg* decision, a case directly on point, relying instead on cases that are inapposite. The defendants' reliance on Ga.Code Ann. § 114–112 (1973) is also misplaced, since that section governs the liability of a principal, intermediate or subcontractor.

of hire or apprenticeship, written or implied . . . ." Ga.Code Ann. § 114–101 (Supp. 1978). In view of the principle espoused by the Georgia courts that the worker's compensation statute "should not be construed to abrogate the common law right of the employee to maintain a negligence action against a defendant," *Scott v. Crescent Tool Co.*, 296 F.Supp. at 160, I conclude that a Georgia court would follow Kentucky, Maryland, New York, North Carolina, South Carolina and Tennessee. Accordingly, the defendants' motion for summary judgment on this point is denied, and the plaintiff's motion for summary judgment dismissing paragraph 13 of the joint answer is granted.

### C. The Georgia Wrongful Death Statute Defense

The Georgia Wrongful Death Act, Ga. Code Ann. ch. 105–13 (1968 & Supp.1978), provides a surviving spouse or parent with a cause of action for the "homicide" of a spouse or child. At the time of the accident at issue herein, actionable "homicide" was defined to include "all cases where the death of a human being results from a crime or from criminal or other negligence." Ga.Code Ann. § 105–1301 (4425) (1968). This language was construed by the Georgia courts to preclude wrongful death actions based on theories of breach of express or implied warranty or strict liability in tort. *Higginbotham v. Ford Motor Co.*, 540 F.2d 762, 768–72 (5th Cir. 1976); *Miles v. Bell Helicopter Co.*, 385 F.Supp. 1029 (N.D. Ga.1974); *Ford Motor Co. v. Carter*, 239 Ga. 657, 238 S.E.2d 361 (1977). The Georgia wrongful death statute was amended effective April 10, 1978 to permit a cause of action for wrongful death arising from a defectively manufactured product without requiring proof of negligence.[12]

Contending that the amendment to the wrongful death statute cannot be retroactively applied, the Grumman defendants move for partial summary judgment to dismiss the strict liability in tort and implied breach of warranty claims in the O'Brien, Whitman and Murphy complaints, *i. e.*, the second and third causes of actions of the O'Brien complaint and the third and fifth causes of action of the Whitman and Murphy complaints. In opposing summary judgment, the three plaintiffs maintain that the New York wrongful death statute, which does not bar wrongful death claims based on strict liability in tort or implied breach of warranty,[13] should apply rather than the Georgia statute. Hence, assuming the amendment to the Georgia statute has no retroactive application,[14] resolution of these summary judgment motions turns on resolution of the choice of law issue.

A federal court presented with a conflict of laws issue in a diversity case must resolve that issue by applying the conflicts law of the state in which it sits. *Klaxon Co. v. Stentor Electric Manufacturing Co.*, 313 U.S. 487, 61 S.Ct. 1020, 85 L.Ed. 1477 (1941); *Rosenthal v. Warren*, 475 F.2d 438 (2d Cir. 1973), *cert. denied*, 414 U.S. 856, 94 S.Ct. 159, 38 L.Ed.2d 106 (1973). New York law thus applies to the conflicts question raised herein.

In *Babcock v. Jackson*, 12 N.Y.2d 473, 240 N.Y.S.2d 743, 191 N.E.2d 279 (1963), the New York Court of Appeals completed a break which had been foreshadowed in *Kilberg v. Northeast Airlines, Inc.*, 9 N.Y.2d

---

**12.** The amended Georgia wrongful death statute defines "homicide" as "the death of a human being result[ing] from a crime or from criminal or other negligence or from defectively manufactured property whether or not the result of negligence." Ga.Code Ann. § 105–1301 (4425) (Supp.1978).

**13.** N.Y. E.P.T.L. § 5–4.1 (McKinney 1967) provides in part: "The personal representative . . . of a decedent who is survived by distributees may maintain an action to recover damages for a wrongful act, neglect or default which caused the decedent's death against a person who would have been liable to the decedent by reason of such wrongful conduct if death had not ensued." *See Ploof v. B.I.M. Trucking Serv., Inc.*, 53 A.D.2d 750, 384 N.Y. S.2d 521 (3d Dep't 1976) (recovery in wrongful death action based on strict liability in tort and breach of implied warranty upheld).

**14.** *See* Ga.Const. art. I, § I, ¶ VII, *codified at* Ga.Code Ann. § 2–107 (1977), which prohibits *inter alia* ex post facto laws.

34, 211 N.Y.S.2d 133, 172 N.E.2d 526 (1961), by abandoning the traditional *lex loci delecti* rule. The Court of Appeals laid the groundwork for the adoption of an "interest analysis" approach to conflict of laws issues by holding that the "center of gravity" or "grouping of contacts" doctrine was applicable to tort cases:

> Justice, fairness and "the best practical result" . . . may best be achieved by giving controlling effect to the law of the jurisdiction which, because of its relationship or contact with the occurrence or the parties has the greatest concern with the specific issue raised in the litigation. The merit of such a rule is that "it gives to the place 'having the most interest in the problem' paramount control over the legal issues arising out of a particular factual context" and thereby allows the forum to apply "the policy of the jurisdiction 'most intimately concerned with the outcome of [the] particular litigation.'"

12 N.Y.2d at 481–82, 240 N.Y.S.2d at 749, 191 N.E.2d at 283 (citations omitted). The conflicts approach established by *Babcock* involves more than a simple counting of contacts, for the New York courts are concerned with the significance of the various contacts as they relate to the interests of the states involved. *Tooker v. Lopez*, 24 N.Y.2d 569, 576, 301 N.Y.S.2d 519, 524–25, 249 N.E.2d 394, 398 (1969); *Miller v. Miller*, 22 N.Y.2d 12, 15–16, 290 N.Y.S.2d 734, 737, 237 N.E.2d 877, 880 (1968).

The relevant contacts in the instant case weigh in favor of applying New York Law.

There is no question that South Carolina law should not be applied. The only contact with that state was the situs of the crash. Since this circumstance was completely fortuitous, see *Long v. Pan American World Airways, Inc.*, 16 N.Y.2d 337, 342, 266 N.Y.S.2d 513, 516–17, 213 N.E.2d 796, 798 (1965), South Carolina has no interest in having its law applied.

Although there are a number of Georgia contacts, their significance is undermined by the fact that they originated in New York. For example, the aircraft in question was manufactured and assembled in Georgia, but it was designed primarily in New York and the first 23 Gulfstream II planes, in fact, were manufactured and assembled in New York. It should be noted that the plaintiffs' essential claim is that the airplane, and the ground spoiler system in particular, was negligently and defectively designed. Although service change no. 98 was issued in Georgia, the design modification was conceived and planned in New York, where the ARB and Grumman Aerospace studied the Gulfstream II aircraft and issued their reports. By its express terms, service change no. 98 was applicable to the first 90 planes in the Gulfstream II line. Since the first 23 were manufactured in New York and the remaining 67 in Georgia, the modification set forth in the service advice was undoubtedly necessitated by a defect in design. Moreover, although the aircraft departed from and was scheduled to return to Savannah, it was maintained and operated by IBM in New York. The plane was not flown down to Savannah until the day before the crash. Finally, although the plane was delivered in Georgia, the contract of sale was negotiated and executed in New York and provides for the application of New York law.

With respect to the "residences" of the parties, the only contacts with Georgia are those of the O'Briens and Grumman American, and even these contacts are less than compelling. The O'Briens were residents of Georgia at the time of the accident, but they moved there from New York in 1968 because of Mr. O'Brien's employment. Although Grumman American has its principal place of business in Georgia, it was incorporated under and exists by virtue of Ohio law. The remaining corporate parties were and are New York corporations. Although the plaintiffs Murphy and Whitman no longer reside in New York, for purposes of resolving choice of law issues, the relevant consideration is the residence of a plaintiff at the time of the accident. *Gore v. Northeast Airlines, Inc.*, 373 F.2d 717, 722–24 (2d Cir. 1967); *Wheeler v. Standard Tool & Manufacturing Co.*, 359 F.Supp. 298, 301 (S.D.N.Y.1973), *aff'd per curiam*, 497

F.2d 897 (1974) (post-accident change of domicile by a plaintiff will not enter into resolution of choice of law issue). *Compare Miller v. Miller*, 22 N.Y.S.2d at 21–22, 290 N.Y.S.2d at 741–42, 237 N.E.2d at 882–83 (post-accident move of a defendant from Maine to New York was considered in determining whether to apply Maine statutory limitation on wrongful death recovery in action brought by New York plaintiff). Hence, the domicile of plaintiffs Whitman and Murphy and their decedents at the date of death is determinative.

In view of the above, New York has the greater interest in having its law applied. Georgia's interest in the action has been considerable weakened by virtue of the amendment to its wrongful death action. By revising the statute to permit wrongful death actions without a showing of negligence, the Georgia legislature has adopted policies more in line with those of New York, opting for greater protection for its residents from defective products. Georgia manufacturers of defective products can no longer automatically escape liability in the absence of a showing of negligence. Georgia certainly has no interest in seeing its former policy, which now has been clearly rejected, applied to this action.

The defendants' contention that giving credence to the amendment to the Georgia statute would be tantamount to applying the amendment retroactively must be rejected. In the first place, the New York Court of Appeals has considered the post-accident repeal of a foreign state's statutory limitation on wrongful death damages in resolving a choice of law issue. *See Miller v. Miller*, 22 N.Y.2d at 21–22, 290 N.Y.S.2d at 741–42, 237 N.E.2d at 882.[15] Secondly, Grumman Corp. and Grumman Aerospace do not have standing to hide behind the former Georgia statute, since they are New York corporations with their principal places of business in New York. Finally, resolution of the conflicts issues herein certainly does not turn on whether the Georgia amendment is taken into consideration.

The *O'Brien* action involves a Georgia plaintiff and New York defendants. Applying New York's wrongful death statute would thus further New York's policy of deterring the negligent or defective design or manufacture of products in New York. And, since no Georgia defendants are involved in the *O'Brien* suit, Georgia's prior policy of limiting the liability of Georgia defendants would not be violated by the application of New York law. Its present policy of protecting Georgia plaintiffs, on the other hand, would certainly be promoted by applying the New York statute.

Since the *Whitman* and *Murphy* actions involve New York plaintiffs and a defendant doing its principal business in Georgia, a true conflict of laws problem is posed if the amended Georgia statute is not taken into consideration. Applying New York law would advance New York's interest in protecting New York plaintiffs while hindering Georgia's former policy of limiting the liability of Georgia defendants. Applying Georgia law would impede New York's pro-plaintiff policy while promoting Georgia's former pro-defendant policy. In similar situations, the New York courts have chosen to apply New York law even where the injury occurred in the foreign state. *See Rosenthal v. Warren*, 475 F.2d at 443 ("[E]xcept for a federal case which relied heavily on a discredited state case, the strong New York public policy against damage limitations has triumphed over the contrary policies of sister states in every case where a New York domiciliary has brought suit."). In view of the significant New

---

15. *See generally* Note, *Post Transaction or Occurrence Events in Conflict of Laws*, 69 Colum. L.Rev. 843 (1969). It may be argued that ignoring the post-accident change in residence of a plaintiff is inconsistent with considering the post-accident amendment of a statute. I disagree, for a key factor in ignoring the change of residence is the prevention of forum shopping. If post-accident changes in residence were to be considered, plaintiffs would be encouraged to manipulate the relevant contacts by changing their place of domicile to take advantage of another state's more favorable laws. The laws of a state and their underlying policies are not within any particular plaintiff's control. Thus, taking a post-accident amendment of a state's statute into consideration would not give rise to forum shopping.

York contacts in the instant situation, New York law must be applied. Any doubt as to this conclusion is dispelled by considering the change in Georgia policy. Accordingly, the motions for summary judgment are denied.

### D. *The Consolidation Motions*

Plaintiffs Whitman and Murphy move to consolidate the *Whitman* and *Murphy* actions for trial of all issues except Grumman American's third party claims against IBM. The Grumman defendants have cross-moved to consolidate all five actions as to the contractual indemnity issues between Grumman American and IBM in the *Whitman, Murphy* and two *O'Brien* actions and as to the contractual exculpatory clause issue in the IBM hull action. Plaintiff O'Brien moves to consolidate the two *O'Brien* actions and to further consolidate the *O'Brien* actions with the *Whitman* and *Murphy* suits. IBM suggests that the wrongful death suits, the third-party apportionment claims, and the hull suit be consolidated for trial by a jury, and that thereafter the contractual issues between IBM and Grumman be tried to the Court.

 Rule 42(a) of the Federal Rules of Civil Procedure provides that a Court may consolidate actions "involving a common question of law or fact." The five actions presently before the Court involve many common questions of law and fact. All five actions arise from one accident and involve common questions concerning Grumman American's possible negligence in designing and manufacturing the aircraft, in failing to recall the Gulfstream II planes in 1971 to correct alleged defects, and in designating service change no. 98 optional instead of mandatory. In addition, IBM's responsibility for any liability incurred by Grumman by virtue of its failure to implement the suggested design modification also raises common questions. These common questions are the central issues in these five actions. Moreover, all five suits are at approximately the same stage of litigation and are almost ready for trial. Hence, there is no danger of any particular action being delayed. On the other hand, the interest of the parties and the public in judicial economy and efficiency will be furthered by consolidation. Finally, the issues are not so complex that confusion and prejudice cannot be avoided. Consequently, all five actions are to be consolidated for trial of all remaining issues.

### CONCLUSION

In accordance with the above, Grumman American's motion for summary judgment dismissing IBM's complaint is granted as to the first cause of action and denied as to the second cause of action. IBM's claim for strict liability in tort is dismissed. Plaintiff O'Brien's motion for summary judgment as to paragraph 13 of Grumman Corp. and Grumman Aerospace's answer is granted. The workmen's compensation defense is stricken. The balance of the summary judgment motions are denied. With respect to the consolidation motions, it is hereby ordered that all five actions be consolidated for the trial of all the remaining issues.

The parties are directed to draft a proposed pretrial order in accordance with my memorandum on pretrial procedures. The proposed pretrial order shall be a single document encompassing all five actions. It is to be submitted to my chambers on or before July 20, 1979. The parties are to attend a pretrial conference on July 27, 1979 at 2 p. m. Trial is scheduled to commence at 10 a. m. on August 20, 1979.

SO ORDERED.