Gwendolyn L. GREGORY, Executrix under the Will of Joseph Morgan Gregory, Deceased, Plaintiffs,

v.

The GARRETT CORPORATION; Colt Electronics Co., Inc.; Phoenix Aerospace, Inc.; and Lockheed Corp., Defendants.

The GARRETT CORPORATION and Lockheed Corporation, Third-Party Plaintiffs,

v.

TEXASGULF, INC. and TexasGulf Aviation, Inc., Third-Party Defendants.

No. 82 Civ. 2316 (GLG).*

United States District Court, S.D. New York.

Dec. 16, 1983.

---

* Together with: 82 Civ. 0816 (GLG), 82 Civ. 1042 (GLG), 82 Civ. 3045 (GLG), 82 Civ. 3640 (GLG), 82 Civ. 3911 (GLG)—82 Civ. 3913 (GLG), 82 Civ. 4997 (GLG), 82 Civ. 5278 (GLG), 82 Civ. 6297 (GLG), 82 Civ. 6459 (GLG), 83 Civ. 1082 (GLG)

See also D.C., 578 F.Supp. 890.

—83 Civ. 1084 (GLG), 83 Civ. 3662 (GLG) and 83 Civ. 3663 (GLG).

Whitman & Ransom, New York City, for plaintiffs Gwendolyn L. Gregory, Mary V. Drew, and Mary L. McKee; Kevin Keating, Richard F. Lawler, New York City, of counsel.

Kreindler & Kreindler, New York City, for plaintiffs Morgan Guaranty (Fogarty), Woodling, and Claydon; Milton G. Sincoff, Steven Earl Anderson, New York City, of counsel.

Speiser & Krause, P.C., New York City, for plaintiff Constance A. Boyle; Frank H. Granito, Jr., New York City, of counsel.

Cummings & Lockwood, Stamford, Conn., for plaintiff Judith N. Sorenson; Mark E. Fuhrmann, Stamford, Conn., of counsel.

Costello & Shea, New York City, Perkins, Coie, Stone, Olsen & Williams, Seattle, Wash., for defendant and third-party plaintiff The Garrett Corp.; J. Donald Tierney, New York City, Keith Gerrard, Richard C. Coyle, Sherilyn Peterson, Seattle, Wash., of counsel.

Lester, Schwab, Katz & Dwyer, New York City, Blackwell, Sanders, Matheny, Weary & Lombardi, Kansas City, Mo., for defendant and third-party plaintiff Colt Electronics Co., Inc.; B. Jennifer Jaffee, New York City, Timothy W. Triplett, Kansas City, Mo., of counsel.

Donovan, Leisure, Newton & Irvine, New York City, Morris, Larson, King, Stamper & Bold, Kansas City, Mo., for defendant and third-party plaintiff Phoenix Aerospace, Inc.; Daniel R. Murdock, New York City, Steven G. Emerson, Kansas City, Mo., of counsel.

Mendes & Mount, New York City, for defendant and third-party plaintiff Lockheed Corp.; Kevin F. Cook, James W. Hunt, James M. Fitzsimons, New York City, of counsel.

J. Paul McGrath, Asst. Atty. Gen., John S. Martin, Jr., U.S. Atty., Dept. of Justice, Torts Branch, Civil Div. by Kathlynn G. Fadely, Susan M.H. Gillett, Trial Attys., Washington, D.C., for defendant U.S.

Townley & Updike, New York City, for defendants and third-party defendants TexasGulf Inc. and TexasGulf Aviation Inc.; Frederick D. Berkon, John C. Sabetta, Michael Belohlavek, New York City, of counsel.

## OPINION

GOETTEL, District Judge:

Presented is a motion for summary judgment that requires the Court to decide very close issues concerning the scope of an employer's immunity from suit under the workers' compensation statutes of New York, Connecticut, and North Carolina. Before those issues can be precisely formu-

lated, however, the complexity of this case requires a fairly detailed accounting of its underlying facts.

FACTS

As has been true of a number of earlier cases involving airplane crashes, this one has grown into a formidable jungle of litigation. There are twenty-one related actions involving numerous direct claims, third-party claims, expert witnesses, requests for discovery, and motions, all springing from a simple but tragic event— an airplane accident that resulted in the death of all persons aboard the aircraft. Those caught up in the litigation include the decedents' families, estates, and employers, as well as the owner and operator of the aircraft, the United States government, and all those corporations that were in any way involved in the design, manufacture, sale, installation, maintenance, or inspection of the critical aircraft components whose failure may have caused, at least in part, the aircraft to crash.

The crash itself occurred at 6:40 p.m. on February 11, 1981, as corporate aircraft N520S, a Lockheed 731 JetStar owned and operated by TexasGulf Aviation, Inc. ("TGA"), approached for a landing at the Westchester County Airport, which lies just north of White Plains, New York. Of the eight persons who died when the JetStar crashed, two were members of its flight crew and six were employées of TexasGulf, Inc. ("TG"), the parent corporation and 100% shareholder of TGA.

More specifically, those on board and their corporate affiliations were as follows:

### Passengers

| | |
|---|---|
| Dr. Charles F. Fogarty | Chairman of the Board and Chief Executive Officer of TG |
| | Chairman of the Board of TGA |
| Gordon N. McKee, Jr. | Vice President and Treasurer of TG |
| | Vice President and Treasurer of TGA |
| Robert J. Boyle | Vice President of TG |
| Clarence E. Drew | Manager of Corporate Communications at TG |
| Frank J. Claydon, Jr. | Vice President of TG |
| Albert D. Woodling | Accounting Superintendent of TG |

### Flight Crew

| | |
|---|---|
| J. Morgan Gregory | President and Director of TGA |
| Shanley S. Sorenson | Pilot for TGA |

Of the six passengers, four (Fogarty, McKee, Boyle, and Drew) were residents of Connecticut and worked for TG in Stamford, Connecticut. The other two passengers (Claydon and Woodling) were residents of North Carolina and worked at a TG office located there. TG is a major mining and mineral exploration company incorporated in Texas and maintaining its principal place of business in Stamford, Connecticut.

The two flight crew members were also residents of Connecticut but worked at TGA's headquarters at the Westchester County Airport in New York. Originally a department of TG, TGA in 1973 was spun off as a subsidiary and incorporated in New York to enable TG to continue to maintain a fleet of readily available corporate aircraft yet still meet the ownership requirements of the Federal Aviation Agency (the "FAA").[1]

1. In 1973 a Canadian corporation purchased 30.4% of TG's outstanding shares. At the time eligibility for registration of an aircraft with the FAA turned in part on the requirement that the aircraft's owner must be a United States citizen, 49 U.S.C. § 1401(b)(1) (1970) (amended in 1977 & 1978). In addition, a corporate owner could be deemed a United States citizen only if no more than 25% of its outstanding shares were owned by foreign citizens, 14 C.F.R. § 47.2 (1973). Thus, the Canadian purchase of TG shares compelled TG to restructure its relationship with its aviation department in order for TG to maintain both maximum accessibility to a fleet of corporate jets and compliance with the FAA regulations. With FAA approval, TG created TGA as a Delaware corporation. In exchange for 100% of the authorized shares of TGA, TG assigned title to each of its aircraft to TGA, which then transferred, pursuant to a voting trust agreement, all of the outstanding stock of TGA to Texas Commerce Bank N.A.

Thereafter until 1982, although TG and TGA observed some of the formalities of separate corporations, the two entities for the most part interacted with one another much as they had when TGA was merely the aviation department of TG. Then in 1982, shortly after TG's Canadian assets were spun off and TG found no continuing need for TGA's separate incorporation, TG

All eight of the decedents had been receiving their paychecks directly from TG, and all eight were covered by a workers' compensation insurance policy issued to TG and certain of TG's subsidiaries. Thus, as soon as the insurer verified that the crash had occurred during the course of the eight individuals' employment as they were returning from a business trip to Toronto, Ontario, approval was given for their surviving spouses (the "survivors")[2] to receive workers' compensation benefits in accordance with the terms of TG's insurance policy. The survivors of the six Connecticut residents accepted benefits under the terms of Connecticut's Workers' Compensation Act, while the two survivors of the North Carolina residents accepted benefits under the terms of North Carolina's Workers' Compensation Act.

■ Not surprisingly, though, the fairly minimal benefits provided under the relevant workers' compensation statutes were hardly enough to match the income that the survivors had been accustomed to receiving while the employees were alive and earning considerable salaries.[3] However, under the applicable statutory provisions, TG as the passengers' employer was, and is, immune from any additional direct liability to the survivors. *See* Conn.Gen.Stat. Ann. § 31–284(a) (1972); N.C.Gen.Stat. § 97–10.1 (1979). Hence, the survivors had to look to other entities if they were to recover any further compensation for the losses they had suffered.

Initially, the survivors followed the lead of TG and TGA, which had brought suit against a number of parties whose services and products were alleged to have caused the accident and thereby TGA's loss of the JetStar. *See TexasGulf, Inc. v. Colt Electronics Co.*, No. 81 Civ. 7147 (S.D.N.Y. filed Nov. 17, 1981).[4] The theory of that pending action is that all those who were connected with the design, manufacture, sale, installation, and inspection of the JetStar's solid-state generator control units ("GCU's") are liable to TGA and TG for the loss of the aircraft because the GCU's failed to perform as specified on the night of the crash. Adopting a similar theory, the survivors filed a number of actions against the same five defendants involved in TGA's suit, namely: (1) Lockheed Corporation ("Lockheed"), which designed and manufactured the JetStar; (2) Phoenix Aerospace, Inc. ("Phoenix"), which designed and manufactured the GCU's that were installed in the JetStar and were in use on the night of the crash; (3) Colt Electronics Co. ("Colt"), which adapted the GCU's for the JetStar and sold them to TGA; (4) The Garrett Corporation ("Garrett"), whose division, AiResearch Aviation Company, located in Islip, New York, installed the GCU's on the aircraft; and (5) the United States (through the FAA), which approved Colt's application for a Supplemental Type Certificate covering the modification of the JetStar's electrical system and the installation of the GCU's into the aircraft, and which is responsible for the conduct of the air traffic controllers who were in communication with the JetStar on the night of the crash.[5]

dissolved TGA, reacquired title to all the aircraft, and returned TGA to its original status of aviation department.

**2.** In sixteen of the actions affected by this motion, the plaintiff is the surviving spouse of one of the decedents and is suing as executrix of his estate. In the remaining two actions, the plaintiff-executor is Morgan Guaranty Trust Company of New York. Nevertheless, for the sake of simplicity, the plaintiffs are referred to throughout the opinion as the "survivors."

**3.** It should be noted that six of the survivors have received additional compensation from TG and TGA in exchange for signed releases relieving those two corporations from any liability

for the crash other than that incurred under the relevant workers' compensation laws. The adequacy of that additional compensation and the validity of the releases are the subject of another motion for summary judgment, which the Court treats in a separate memorandum decision published simultaneously with this opinion.

**4.** The instant motion in no way concerns this action by TGA.

**5.** The actions against the four corporate defendants, all filed as related actions, can be identified by the docket numbers 82 Civ. 816, 82 Civ. 2316, 82 Civ. 3045, 82 Civ. 3911, 82 Civ. 3912, 82

These defendants have, in turn, impleaded TG and TGA as third-party defendants on the theory that the crash was actually caused by the negligence of the flight and maintenance personnel working out of TGA's office and hangar at the Westchester Airport. The five defendants seek contribution from TG and TGA for any liability that is actually found to be attributable to the latter two parties.[6] In addition, the survivors of four of the passengers have brought wrongful death actions directly against TGA on the theory that the workers' compensation immunity that admittedly protects TG, the parent corporation, does not extend to its subsidiary, TGA.[7]

In the instant motion for summary judgment, TG and TGA seek dismissal of both the third-party claims and the direct claims. With respect to the third-party claims, TG and TGA put forth a two-part argument, both parts of which are essential to their motion. First, they argue that the issue of whether the third-party claims for contribution can be brought against TG as the employer is to be decided under the laws of Connecticut and North Carolina, and those laws clearly prohibit such claims. Second, TG and TGA argue that this immunity from contribution claims extends not only to TG but also to TGA, because the flight and maintenance crews and the passengers were co-employees, all in the employment of TG, and because TG and TGA must be considered as a single corporate entity. Garrett and the other defendants dispute both parts of TG's and TGA's argument. First, Garrett contends that New York law governs the issue of contribution and that New York's law clearly permits contribution claims in the workers' compensation context. Second, Garrett argues that even if Connecticut and North Carolina law were to apply, the scope of immunity under those states' laws would cover only TG and not TGA, because the two are separate corporate entities and TG is the sole employer of the passengers while TGA is the sole employer of the flight and maintenance crews.

As for the claims of the four survivors who are suing TGA directly, TGA moves for summary judgment on the same grounds, i.e., that the laws of Connecticut and North Carolina apply and that TGA as well as TG is immune from suit under those laws. While all but one of the plaintiffs agree that Connecticut's and North Carolina's laws apply, they disagree with TGA as to the scope of immunity provided under those laws. Their contention is that TGA is not immune from suit by the passengers because, as a separate corporate entity, the owner and operator of the JetStar, and the sole employer of the flight and maintenance crews, TGA cannot be considered the alter ego of TG and its crew members cannot be treated as co-employees of the passengers.

Having carefully reviewed the above arguments of the parties, the Court concludes for reasons set forth below that TG's and TGA's motion for summary judgment must be denied with respect to both the third-party claims and the direct claims, and that a full evidentiary hearing on the factual issues discussed below should be held as soon as possible.

DISCUSSION

The Court first considers the issues raised with respect to the actions involving third-party claims for contribution and then turns to the issues raised with respect to the plaintiffs' direct suits against TGA.

I. *The Immunity Defense of TG and TGA With Respect to the Third-Party Claims of the Defendants*

■ With respect to the third-party claims, the initial issue is a conflict of laws

---

Civ. 3913, and 82 Civ. 5278. The actions against the United States, also filed as related actions, can be identified by the docket numbers 82 Civ. 6296, 82 Civ. 6297, 82 Civ. 6459, 83 Civ. 1045, 83 Civ. 1082, 83 Civ. 1083, and 83 Civ. 1084.

**6.** As used in this opinion, the term "contribution" refers both to contribution and to any implied right of indemnity, but not to any express, contractual right of indemnity.

**7.** These actions can be identified by the docket numbers 82 Civ. 3640, 83 Civ. 4997, 83 Civ. 3662, and 83 Civ. 3663.

question. All of the parties more or less agree upon what the law of each state is.[8] They also agree that if the Court determines that the law to be applied is that of New York, then there is no need to consider the second critical issue, that concerning the nature of the interrelationship of TG, TGA, and the flight and maintenance personnel. In other words, only if the Court finds that the law of Connecticut or North Carolina should be applied will it have to determine whether any immunity accorded TG also protects TGA. This is so because the law of the latter two states grants the employer immunity from third-party contribution claims, while the law of New York does not.

### A. Employer's Liability to Third Parties, Generally

■ The ultimate issue to be determined here is whether under the applicable workers' compensation laws TG (and perhaps TGA), as the employer, is immune from any third-party contribution claims brought by Garrett and the other parties who are defending against the tort claims filed by the survivors of TG's six deceased employees. In general, the issue of an employer's liability to third-party claims has been characterized as one of the most closely contested controversies in the field of workers' compensation law,[9] and understandably so. After all, this is not the situation presented by the classic employer immunity rule, under which the employer is protected against any direct tort claims that the employee or his survivors might otherwise have. That basic immunity rule serves as the quid pro quo for the insurance coverage provided to the employee and his survivors, which encompasses even work-related accidents for which the employer could not be held liable under the common law. See, e.g., Conn.

Gen.Stat.Ann. § 31–284(a) (1972); N.Y. Work.Comp.Law § 29(6) (McKinney's Supp. 1982); N.C.Gen.Stat. § 97–10.1 (1979).

Here, however, the Court is faced with the problem of whether the employer's immunity should protect him against the contribution or indemnity claims of a third party plaintiff who is a complete stranger to the employment relationship and who is effectively being held liable for injury or death caused at least in part by the employer. This problem is a much more difficult one. On the one hand, the employer can argue with great conviction and merit that to permit the contribution claim is to allow indirectly a recovery for a compensable injury that would not be allowed directly because of the statutory limitations that have been put on the employer's liability for such injuries. See 2A Larson, Workmen's Compensation Law § 76.11, at 14–562 (1982); also Elston v. Industrial Lift Truck Co., 420 Pa. 97, 216 A.2d 318, 320 n. 3 (1966) (noting the anomaly that, absent a limitation on the contribution that can be exacted from the employer, "he would be exposed to a potentially larger liability in those circumstances in which a third-party tortfeasor was involved than where his own negligence was the sole cause of the injury"). On the other hand, the third-party plaintiff can argue with equal cogency that he should not have to bear any portion of the liability not caused by him simply because chance would have it that the otherwise liable party happens to enjoy the immunity of the compensation act. "Why should [the third party], a stranger to the compensation system, subsidize that system by assuming liabilities that he could normally shift to or share with the employer?" 2A Larson, supra, § 76.11, at 14–563. With such persuasive arguments on

---

**8.** Although defendant Garrett does argue that Connecticut law is unclear on this point, the Court finds no reason or authority for giving any other interpretation of Connecticut law than that uniformly stated in the opinions of Connecticut's lower courts and the U.S. District Court of Connecticut. See infra p. 879 & note 10.

**9.** In Professor Larson's oft quoted words: "Perhaps the most evenly-balanced controversy in all of compensation law is the question of whether a third party in an action by the employee can get contribution or indemnity from the employer, when the employer's negligence has caused or contributed to the injury." 2A Larson, Workmen's Compensation Law § 76.11, at 14–561 (1982).

either side of the issue, it is not surprising that the courts of different states have resolved it differently.

## B. Conflicting State Laws

■ Turning to the states whose laws arguably govern this issue, we find that Connecticut and North Carolina have followed what is clearly the majority rule. That rule, stated in general terms, is "that the employer whose concurring negligence contributed to the employee's injury cannot be sued or joined by the third party as a joint tortfeasor, whether under contribution statutes or at common law." 2A Larson, *supra,* § 76.20, at .14–571. In the most often cited Connecticut case on this point, it was held that "the compensation act is the 'exclusive remedy' available against an employer and restricts his liability accordingly." *A.A. Equipment, Inc. v. Farmoil, Inc.,* 31 Conn.Supp. 322, 330 A.2d 99, 100–01 (Super.Ct.1974); *see also, Cirrito v. Continental Can Co.,* 519 F.Supp. 638, 640 (D.Conn.1981) ("It is clear that a third party should not be permitted to raise the issue of employer negligence in a suit or counterclaim for indemnification or contribution against the employer."); *Therrien v. Safeguard Manufacturing Co.,* 35 Conn.Supp. 268, 408 A.2d 273, 276 (Super. Ct.1979). Similarly, the supreme court of North Carolina has held that "the North Carolina Workmen's Compensation Act abrogates the statutory right of a negligent third party to claim contribution from a negligent employer in equal fault ...." *Hunsucker v. High Point Bending & Chair Co.,* 237 N.C. 559, 75 S.E.2d 768, 777 (1953). Clearly then, both of these states have made a policy decision to adopt the majority view, which, as Professor Larson

points out, favors a pro-employer resolution of the issue and stresses the value of stability in the field of workers' compensation law. *See,* 2A Larson, *supra,* §§ 76.-91(a) & 76.92(a).[10]

■ New York, in direct contrast, has adopted the most pro-third-party approach of any state in the United States, one which stresses the value of fairness above all other considerations and downplays the exclusive liability provisions of the workers' compensation act. 2A Larson, *supra,* §§ 76.91(b) & 76.92(b). This policy was announced in the New York Court of Appeal's landmark ruling in *Dole v. Dow Chemical Co.,* 30 N.Y.2d 143, 152–53, 282 N.E.2d 288, 331 N.Y.S.2d 382, 390–91 (1972). There the court held in very broad terms that the "[r]ight to apportionment of liability or to full indemnity, ... as among parties involved together in causing damage by negligence, should rest on relative responsibility and ... be determined on the facts." *Id.* at 153, 282 N.E.2d at 297–98, 331 N.Y.S.2d at 391–92. Although the court couched the right of the third-party tortfeasor in terms of an implied right to indemnity, the ease with which such an implied right was found among mere joint tortfeasors suggested that the right was essentially the equivalent of the right to contribution, 2A Larson, *supra,* § 76.38, at 14–623, and courts ever since have so interpreted the holding in *Dole, see, e.g., Ackerman v. Southern Wood Piedmont Co.,* 409 F.Supp. 469, 471–72 (E.D.N.Y.1976); *Coons v. Washington Mirror Works, Inc.,* 344 F.Supp. 653, 657–58 (S.D.N.Y.1972), *rev'd on other grounds,* 477 F.2d 864 (2d Cir. 1973).

Thus, the Court is faced with as clear a conflict of laws and policy choices as could

---

**10.** To be accurate, two additional points should be noted. First, in the case of Connecticut, there has been a clear decision not to adopt or create any right of contribution among tortfeasors, even outside of the workers' compensation context. *See, e.g., Gomeau v. Forrest,* 176 Conn. 523, 409 A.2d 1006, 1007 (1979). Second, North Carolina has decided that in cases involving an actively negligent employer and a passively negligent third party the total liability of the third party to the employee should be re-

duced by the amount of compensation already paid by the employer's workers' compensation insurance. *Hunsucker v. High Point Bending & Chair Co.,* 237 N.C. 559, 75 S.E.2d 768, 773 (1953). Although from the third party's point of view this result has some of the same effects that contribution would, it is not the same from the perspective of the employer or from that of the employee, who is merely being deprived of a windfall recovery equivalent to the value of his workers' compensation benefits.

exist. New York's answer to this hotly disputed question of workers' compensation law is exactly the opposite of the answer reached by Connecticut and North Carolina. As a consequence, this Court must first determine which state's law should be applied before it can resolve the ultimate issue of whether TG as the employer is immune from the third-party contribution claims.

### C. *Conflict of Laws Analysis*

■ Because jurisdiction over these various actions is based upon the parties' diverse citizenship, the Court is required to apply the choice of law rules of New York, the forum state, to determine which state's substantive law should be applied to any given issue. *Klaxon . v. Stentor Electric Manufacturing Co.*, 313 U.S. 487, 496–97, 61 S.Ct. 1020, 1021–22, 85 L.Ed. 1477 (1941). Thus, as the Second Circuit has so aptly put the matter, "Our task ... is to determine not what law we would choose to apply but what law the New York courts would apply." *O'Connor v. Lee-Hy Paving Corp.*, 579 F.2d 194, 205 (2d Cir.), *cert. denied*, 439 U.S. 1034, 99 S.Ct. 638, 58 L.Ed.2d 696 (1978).

■ In this regard, the New York Court of Appeals has held that "[j]ustice, fairness and 'the best practical result' ... may best be achieved by giving controlling effect to the law of the jurisdiction which, because of its relationship or contact with the occurrence or the parties, has the greatest concern with the specific issue raised in the litigation." *Babcock v. Jackson*, 12 N.Y.2d 473, 481, 191 N.E.2d 279, 285, 240 N.Y.S.2d 743, 749 (1963). Although resort to this "governmental interest" test may have been modified to some

extent in *Cousins v. Instrument Flyers, Inc.*, 44 N.Y.2d 698, 699, 376 N.E.2d 914, 915, 405 N.Y.S.2d 441, 442 (1978) ("*[L]ex loci delicti* remains the general rule in tort cases to be displaced only in extraordinary circumstances ...."), the instant case does present the type of extraordinary circumstances that require application of the interest analysis adopted in *Babcock* and applied in numerous cases since. We are dealing with an airplane crash, the situs of which was at least to some extent fortuitous.[11] In similar cases, courts applying New York law have consistently looked beyond the situs of the accident and considered a number of other contacts that each of the various states has had with the parties and events in question before deciding which state's law should be applied to determine a particular issue. *See, e.g., Pan American World Airways, Inc. v. Boeing Co.*, 500 F.Supp. 656, 660–61 (S.D. N.Y.1980); *O'Brien v. Grumman Corp.*, 475 F.Supp. 284, 293–95 (S.D.N.Y.1979); *Cousins, supra*, 44 N.Y.2d at 699–700, 376 N.E.2d 914, 405 N.Y.S.2d 441.

Thus, in an action sounding in tort, the types of contacts most often considered are: (1) the state in which the injury or death occurred, (2) the state in which the conduct occurred that caused the injury or death, (3) the domicile or place of business of each of the parties, and (4) the state in which the relationship between the parties is centered. Restatement (Second) of Conflict of Laws § 145(b)(2) (1971). In addition, because of the nature of the issue before the court, two other factors should be considered as well, namely: the principal place of employment of the individuals involved and the states under whose laws the survivors have accepted workers' compensation benefits.[12] *See, e.g., O'Connor*

---

11. The Court disagrees with the contention of Garrett and the other defendants that the situs of the crash was in no way fortuitous. While it is true that the round trip began and ended in New York and that much of the flight in both directions was over that state, the accident well might have occurred in Canada during either the takeoff or landing at Toronto, or in Connecticut, which abuts the Westchester County Airport to the northeast.

12. TG and TGA would have the court raise to a position of preeminence the latter of these two factors—the state under whose laws workers' compensation benefits have been accepted. This the Court is unwilling to do, though it does accord that factor considerable significance because it points to the state that has the greatest interest in having upheld the exclusive remedy provisions of its workers' compensation act. However, to accord that factor preeminence

*v. Lee-Hy Paving, supra,* 579 F.2d at 204; *Ackerman v. Southern Wood Piedmont Co., supra,* 409 F.Supp. at 472.

With these types of contact in mind, all of the parties agree that Connecticut, North Carolina, and New York are the three states having the most important contacts with the parties and events in question. New York's interest in the case derives from its being: (1) the situs of the accident; (2) the state in which most of the allegedly negligent conduct of the agents of TGA and the defendants occurred; (3) the principal place of business of TGA, and (4) the place where the critical relationships between TGA and the defendants and between the defendants and the plaintiffs are centered.[13] Connecticut's interest in the case derives from its being: (1) the principal place of business of the employer TG; (2) the domicile of four of the passengers, as well as of the two flight crew members; (3) the primary place of employment for those four passengers; and (4) the state under whose law their survivors have accepted and are receiving workers' compensation benefits. Finally, North Carolina has an interest as: (1) the domicile of the other two passengers; (2) the primary place of their employment; and (3) the state under whose laws their survivors have accepted and are receiving workers' compensation benefits.

Confronted with this array of contacts, the Court concludes that a New York court would apply the law of New York to determine whether TG and TGA can be held liable to third-parties for claims of contribution. Although the Court does not reach this conclusion easily, it finds a number of reasons for doing so.

■ First, at the most general level, is the strong support that is found in the Restatement (Second). "When the injury [has] occurred in a single, clearly ascertainable state and when the conduct which caused the injury also occurred there, that state will usually be the state of the applicable law with respect to most issues involving the tort." Restatement (Second) of Conflict of Laws § 145 comment (e) (1971). Here we find that New York was not only the situs of the "injury" and the place where most of the purportedly negligent conduct occurred,[14] but also the principal

would be to downplay unjustifiably New York's equally important interest in subordinating such exclusive remedy provisions to its rule in favor of contribution. To single out either of these two interests and give it preeminence by ruling that one type of contact is determinative would be to avoid confronting the true conflicts problem presented by this case.

Nor is TG and TGA's position on this matter strengthened by their reference to the Restatement (Second). The key sentence in comment b, upon which they rely, reads: "A *person who accepts an award* under the workmen's compensation statute of a given state may justly be held bound by the provisions of that statute insofar as immunity from tort and wrongful death liability is concerned." Restatement (Second) § 184 comment b (1982) (emphasis added). Although this statement appears at first glance to lend credence to the position taken by TG and TGA, it is not intended to be applied to the claims of third-parties who were never part of the employment relationship. This limitation is suggested not only by the words of the statement itself, but also by a full reading of both comment b and comment c, which reveals that the latter comment is the one applicable to third-party claims. Comment c directs one trying to decide which law should apply to determine an employer's immunity from such claims to refer to section 173, which in turn directs one to the four factors listed under section 145. Thus, the test that this Court applies is justified not only logically, because a stranger should not automatically be bound by the law of the state where the employment relationship is centered, but also more formally by the dictates of the Restatement (Second) itself.

13. Although this factor overlaps the others in part, it needs to be given a separate place of its own. Most critically, New York was the center of the relationships between the parties in that it was the state from which the passengers departed and to which they were to return and the state from which TGA made its critical contacts with several of the five defendants and contracted to have the JetStar modified, tested, and inspected.

14. Among the critical aspects of the alleged negligent conduct that occurred in New York were the following: the maintenance of the JetStar, the modification, installation, inspection, and repair of the GCU's, the giving of maintenance and flight instructions to the flight crew on the day in question, and the operation of the JetStar during much of the flight itself.

place of business of one of the most critical parties, TGA,[15] and the state in which the complex relationships between the various parties are centered. With such an alignment of factors, the force of comment e of section 145 is magnified and the application of New York law is forcefully called for.

The second reason why the Court believes New York law must be applied here is that such application is called for under the general policies expressed by the New York Court of Appeals in *Neumeier v. Kuehner*, 31 N.Y.2d 121, 130, 286 N.E.2d 454, 461, 335 N.Y.S.2d 64, 71 (1972). There the court posited a special rule of law for determining whose law should be applied when: (1) the question is whether a driver's guest injured as a result of the driver's negligence may bring a cause of action against the driver and (2) the guest and driver are residents of different jurisdictions. In that situation, the court held that "the applicable rule of decision will be that of the state where the accident occurred but not if it can be shown that displacing that normally applicable rule will advance the relevant substantive law purposes without impairing the smooth working of the multi-state system or producing great uncertainty for litigants." *Id.* at 128, 286 N.E.2d at 460, 335 N.Y.S.2d at 70. The general policy that has been derived from this very specific rule is that the law of the state in which the accident occurred should apply if one of the parties to the action is domiciled in that state, unless application of another state's law would do more to advance the policies underlying the relevant laws of the various jurisdictions involved. In the instant case, where the application of one state's laws and policies is necessarily at the expense of the other states', there is no reason for displacing the general rule that the law of the state in which the injury occurred should be applied, particularly since that state is also where most of the negligent conduct occurred, where TGA has its principal place of business, and where the complex relationships between the parties are centered.

Given the fairly clear policy set forth in *Neumeier*, it is not surprising that other courts have applied the *Neumeier* rationale in a range of different contexts. Most significantly, in *Ackerman v. Southern Wood Piedmont, supra,* 409 F.Supp. at 472, Judge Neaher relied upon *Neumeier* and other New York decisions to support his conclusion that New York law should apply in a case involving the same issue as is found in the instant case, as well as similar facts. In *Ackerman,* Judge Neaher gave greater weight to the fact that the injury and the conduct causing the injury had both occurred in New York and lesser weight to the fact that New Jersey had an interest as the domicile of the plaintiffs, the center of the employment relationship, and the state under whose law workers' compensation benefits were being paid. *Id.* at 472. Although one might question the reasoning in *Ackerman* for giving what appears to have been too little consideration to New Jersey's express interest in barring third-party actions against employers, one can hardly disagree with the proposition that a New York court, faced with the same situation, would stress the same contacts emphasized by Judge Neaher and reach the same conclusion. This is true primarily because a New York court would be persuaded, as was Judge Neaher, that New York has an overwhelming "interest in the advancement of its strong public policy to hold a co-tortfeasor, albeit an employer of the plaintiff, responsible to the other tortfeasors for its proportionate share of a plaintiff's injury." *Id.* at 472.

**15.** TG and TGA mention in passing that Garrett and the other three corporate defendants have principal places of business in states with laws that bar third-party contribution claims against the employer, just as do Connecticut and North Carolina. Little or no significance can be attributed to this fact, however. Because these corporate defendants are truly strangers to the relevant employment relationships, the workers' compensation laws of the states in which the defendants have their principal places of business are of no relevance to the present case. Furthermore, even if this factor were of some significance, it would remain critically offset by the presence of TGA's principal place of business in New York, as well as by the several other contacts that New York has with the parties and events in question.

Indeed, it is the strength of this interest, effectively created by the holding in *Dole v. Dow Chemical Co., supra,* 30 N.Y.2d at 152–53, 282 N.E.2d at 296–97, 331 N.Y.S.2d at 390–91, that provides the third and perhaps most compelling argument for the application of New York law. A New York court, confronted with a tort claim based upon events and conduct occurring primarily in New York and knowing the striking stand taken in *Dole* on the issue of third party contribution, a position diametrically opposed to that of the majority of states, would have no hesitation in applying New York law here. Not to do so would be to undermine one of the primary purposes of New York's rule, that is to deter tortious conduct by attributing liability and damages among joint tortfeasors in proportion to their relative responsibility for injuries and losses, regardless of whether one of the tortfeasors happens to be an employer. This rule after all is one that implements the "tort policy goals of deterrence, equitable loss sharing by all wrongdoers, effective loss distribution over a large segment of society, and rapid compensation of the plaintiff...." *Id.* at 150, 282 N.E.2d at 295, 331 N.Y.S.2d at 389 (quoting Werner, *Contribution and Indemnity,* 57 Cal.L. Rev. 490, 516 (1969)). Because *Dole* itself was a workers' compensation case and because the rule it announced is in great part designed to deter tortious conduct, the Court does not see how in the instant case it can apply the opposite rule of Connecticut when New York has so many critical contacts with the parties and events in question.

The final argument for applying New York law is that the authority cited by TG and TGA in favor of applying Connecticut law is not apposite. In the first place, the two New York cases cited by TG and TGA as most supportive of their argument involve claims between those directly involved in employment relationships rather than third-party contribution claims brought by strangers to such relationships. *See O'Brien v. Grumman Corp.,* 475 F.Supp. 284, 291 (S.D.N.Y.1979) (applying the law of the state where benefits were paid to determine issues raised in employee's direct claim against the employer); *In re Estate of O'Connor,* 21 A.D.2d 333, 335, 250 N.Y.S.2d 696, 698 (1964) (applying the law of the state where benefits were accepted to determine issues raised by insurer's subrogation claim against deceased employee's estate). As has already been explained, *see supra* note 12, the determination of which law should be applied to decide the rights of those directly involved in the employment relationships requires consideration of different factors than those that must be weighed when a stranger is involved. Indeed, this point was made expressly in *Tuffarella v. Erie Railroad Co.,* 17 A.D.2d 484, 236 N.Y.S.2d 503, 507 (1962), when the court noted that "the question of whether or not a right of contribution existed must be determined by the law of the place of the accident, whereas questions relating to the injured employee's rights against his employer [are] to be determined by the law of the State whose workmen's compensation law defines and controls the rights and remedies of employee against employer." Consequently, *O'Brien* and *O'Connor* are of no real precedential value.

More importantly, the primary case upon which TG and TGA base their argument for applying Connecticut law, *Elston v. Industrial Lift Truck Co.,* 420 Pa. 97, 216 A.2d 318 (1966), is distinguishable in ways that are so critical that it also is of little or no precedential value. First, with regard to the question of choice of laws, *Elston* represents the choice of law rules of Pennsylvania as determined by that state's supreme court. There is no reason to believe that New York's choice of law rules would be similarly determined by a New York court, even if uniformity of such rules is one of the most sought-after objectives in this particular field of law. Even though one may admire the *Elston* court's extraordinary deference to the interests of New Jersey, whose law was ultimately applied, that admiration does not necessarily lead one to the conclusion that a New York court would show similar deference in the same situation, let alone in the much different situation presented in the instant case.

Second, the laws of Pennsylvania and New Jersey, between which the *Elston* court had to choose, were not in diametric opposition to one another as are the laws of New York and Connecticut, or North Carolina. Indeed, Pennsylvania and New Jersey both honored the exclusive remedy provisions of their workers' compensation acts. The only difference was that while New Jersey completely barred third-party contribution recovery, Pennsylvania merely limited such recovery to the amount of the employer's liability under the workers' compensation act. *Elston, supra,* 216 A.2d at 320. As the court said, "In so restricting recovery, Pennsylvania, preserves the limited liability feature of its workmen's compensation act while at the same time giving partial effect to its policy in favor of contribution between joint tortfeasors." *Id.* The fact that the underlying policies of Pennsylvania were primarily in accord with those of New Jersey was a critical factor in the court's determination that New Jersey law should be applied. *Id.* 216 A.2d at 324. That factor is not present in the instant case.

Finally and perhaps most importantly, *Elston* is distinguishable on its facts. In that case the foreign state, New Jersey, was not just the state under whose law benefits were paid but also the state in which occurred the injury and the conduct that caused the injury. This court has little doubt that a New York court, or the court of any state for that matter, if faced with such an overwhelming combination of significant contacts would have held just as the Pennsylvania court held. However, we are not faced with the same set of facts; rather, we find that while Connecticut is the state under whose laws benefits have been accepted, New York is the state where the deaths and most of the allegedly negligent conduct occurred.[16]

Thus, *Elston* is inapposite in three critical ways—on its facts, on the substantive laws, which were in only partial conflict, and on the choice of laws rules that were applied. Thus, even though this court views that case with considerable respect, particularly for its thorough and scholarly analysis, its final result offers little guidance in the instant action.

In sum, the lack of precedent in support of TG's and TGA's argument for the application of Connecticut, or North Carolina, law and the strong authority and reasoning favoring the application of New York law compel the Court to conclude that New York law should be applied to determine the issue of whether the third-party claims of Garrett and the other defendants ought to go forward. Because New York does permit such claims and does favor a policy of contribution among tortfeasors, including the employer, TG's and TGA's motion for summary judgment with respect to the third-party claims is denied.[17]

## II. *TGA's Motion for Summary Judgment with Respect to the Direct Claims of Morgan Guaranty Trust, Boyle, Claydon, and Woodling*

In the four direct actions brought against TGA for the alleged negligence of

---

**16.** Although there have been later cases relying upon *Elston* that involved fact patterns much closer to that of the instant case, *see, e.g., Colombo v. Republic Steel Corp.,* 448 F.Supp. 833, 834 (W.D.Pa.1978) (applying New York's contribution rule because the plaintiff resided and received benefits there, even though Pennsylvania was the site of the injury and the conduct causing that injury), this Court neither is bound by those decisions nor believes that they are supported by a proper reading of *Elston.* To interpret that case as standing for the proposition that the law to be applied is that of the state where benefits are paid is to ignore the extraordinary pains taken by the *Elston* court to justify and circumscribe its holding.

**17.** The Court does not foreclose the possibility of reconsidering this issue in the event that TG and TGA prove at trial that for workers' compensation purposes TGA should be viewed as a department of TG rather than as a separate corporation. *See infra* pp. 885–887. Such a finding could arguably diminish the importance of New York being TGA's principal place of business. Although the lessening of the importance of that contact might not be enough to swing the balance so that the application of Connecticut or North Carolina law is required, the Court prefers to await the outcome of trial before considering the issue, particularly since it will need to be more fully briefed before it is decided.

its flight and maintenance crews, TGA seeks summary judgment on the ground that the workers' compensation statutes of Connecticut and North Carolina apply and that an employer's immunity thereunder protects TGA as well as TG. TGA, in a rather sophisticated argument sets forth two separate theories in support of this immunity defense. The first theory is that TG and TGA were not separate entities for employment purposes but rather a single entity, that TGA was no more than an aviation department of TG, and that, as such, TGA had no purpose other than to carry out a part of TG's business. Because the subsidiary was in effect the alter ego of the parent, concludes TGA, the former is just as immune from suit as is the latter. TGA's second theory of immunity is that all members of its flight and maintenance crews were actually employed by TG, not TGA, and were thus co-employees of the six passengers. As co-employees, argues TGA, these crew members are immune from suit, and if they are immune so must TGA be for it can be found liable only if they, as its agents, are found liable.

Of course, for the Court to grant this motion for summary judgment, TGA, as the moving party, must demonstrate a complete absence of controversy as to all facts material to the resolution of the above legal issues. Fed.R.Civ.P. 56; *Adickes v. S.H. Kress & Co.*, 398 U.S. 144, 157, 90 S.Ct. 1598, 1608, 26 L.Ed.2d 142 (1970). In determining whether this requirement has been satisfied, the court must draw all reasonable inferences against the moving party. *American International Group, Inc. v. London American International Corp.*, 664 F.2d 348, 351 (2d Cir.1981). If the party opposing summary judgment "generates uncertainty as to the true state of any material fact, the procedural weapon of summary judgment is inappropriate." *Id.* (quoting *Quinn v. Syracuse Model Neighborhood Corp.*, 613 F.2d 438, 444–45 (2d Cir.1980). Unfortunately for TGA, just such uncertainty has been raised by the plaintiffs.

On the one hand, the facts upon which TGA bases its two theories are rather more compelling than is usually the case when this type of defense is put forth. For example, it appears that TGA transported primarily, if not solely, TG employees on official TG business. Furthermore, TGA was originally, and is once again, a mere aviation department of TG. Indeed, it seems likely that TGA would have been a department at the time of the accident had its separate incorporation not been caused by the need to comply with federal laws and regulations having to do with a consideration extraneous to this case—the citizenship of corporate stockholders. *See supra* note 1. Even then, all of TGA's shares were indirectly owned by TG through a voting trust, which TG established with FAA approval. Moreover, it appears that all of TGA's flight and maintenance crew members were paid by TG. Finally, TGA apparently paid no income taxes, and its expenses were passed directly through to TG and appeared on TG's consolidated financial statement.

On the other hand, there does not appear to have been a complete integration of the two entities, and certain aspects of the complex of relationships between TG, TGA, and the flight and maintenance crew members remain at issue at this point. The most significant of these is the overwhelming amount of documentary evidence suggesting that the ownership and operation of the JetStar and other TGA aircraft were exclusively in the hands of TGA and that neither TG nor its executives had the right to exercise any control over the operation of TGA flights other than to determine their destinations and desired times of arrival. In addition, TGA appears to have held itself out to the public as a separate corporate entity in a number of ways. For example, its name alone appears on a number of FAA and Department of Labor documents which indicate that TGA was the sole operator of the various aircraft and that it had its own personnel. Finally, there is a question of fact concerning the nature of the work of the flight and maintenance crews as it related to the overall business purpose of first TGA and second

TG. If TGA's business purpose was the operation of aircraft and TG's business purpose the discovery and mining of minerals, then one question that may have to be answered is the extent to which the flight and maintenance crews of TGA were furthering the business of TG, as distinct from that of TGA, at the time of the flight.

As the discussion below brings out further, these unanswered questions require the Court to submit the dual aspects of TGA's defense to a full evidentiary hearing. Thus, even if we assume that TGA is correct in its summary of the law with regard to its theories of merged entities, joint employment, and vicarious liability, TGA's motion for summary judgment must be denied.

### A. Law of Connecticut and North Carolina Applies

■ Although plaintiff Boyle contends that New York law applies to these issues, the three other plaintiffs and TGA agree that the law of Connecticut and North Carolina applies. In this instance, the Court has little difficulty in determining that it is the law of the latter two states that is applicable. Here, we do have the type of claim—one brought by the survivor directly against the employer's subsidiary (and perhaps alter ego)—that is covered by comment b to section 184 of the Restatement (Second) of Conflict of Laws. *See supra* note 12. The plaintiffs, having chosen to receive benefits under the compensation laws of Connecticut and North Carolina, respectively, must accept the immunity conditions that are laid down by the statutes and case law of those two states. Restatement (Second) of Conflict of Laws § 184 comment b (1971); *see also O'Brien v. Grumman Corp.*, 475 F.Supp. 284, 291 (1979).

### B. Should TGA and TG Be Considered as a Single Entity?

■ TGA's initial claim that it was merely the alter ego of TG is an extremely difficult one to prove. Whether one looks at this contention as an effort to pierce the corporate veil or as an argument that the parent and subsidiary were actually so intertwined as to be a single entity, it represents a legal theory that has not met with a warm reception in the courts of most states, including those of Connecticut, North Carolina, and New York. *See, e.g., Boggs v. Blue Diamond Coal Co.*, 590 F.2d 655, 662 (6th Cir.), *cert. denied*, 444 U.S. 836, 100 S.Ct. 71, 62 L.Ed.2d 47 (1979) (applying Kentucky law); *Peterson v. Trailways, Inc.*, 555 F.Supp. 827, 833–34 (D.Colo.1983); *Stoddard v. Ling-Temco-Vought, Inc.*, 513 F.Supp. 314, 326 (C.D. Cal.1980) (applying Texas law), *remanded on other grounds sub nom. Ashland v. Ling-Temco-Vought, Inc.*, 711 F.2d 1431 (9th Cir.1983); *O'Brien v. Grumman Corp.*, 475 F.Supp. 284, 292–93 (S.D.N.Y. 1979) (applying Georgia law); *Samaras v. GATX Leasing Corp.*, 75 A.D.2d 890, 428 N.Y.S.2d 48, 49 (2d Dep't 1980); *Phillips v. Stowe Mills, Inc.*, 5 N.C.App. 150, 167 S.E.2d 817, 819–20 (1969); *Daisernia v. Co-operative G.L.F. Holding Corp.*, 26 A.D.2d 594, 270 N.Y.S.2d 542, 543 (3d Dep't 1966); *Doe v. Saracyn Corp.*, 138 Conn. 69, 82 A.2d 811, 816 (1951); *Wheeler v. New York, N.H. & H.R. Co.*, 112 Conn. 510, 153 A. 159, 160 (1931). *But see, e.g., Wells v. Firestone Tire & Rubber Co.*, 97 Mich.App. 790, 296 N.W.2d 174, 176–77 (1980); *Coco v. Winston Industries, Inc.*, 330 So.2d 649, 654–55 (La.App.1975), *rev'd on other grounds*, 341 So.2d 332 (1976). The reluctance with which the alter ego theory is greeted stems from a rather straightforward principle of fairness: that one who has gained the advantages of separate incorporation must also be willing to accept the consequences of such incorporation.[18]

---

**18.** As applied in the workers' compensation context, this principle has been stated most succinctly by the Sixth Circuit in *Boggs v. Blue Diamond Coal Co.*, 590 F.2d 655, 662 (6th Cir.), *cert. denied*, 444 U.S. 836, 100 S.Ct. 71, 62 L.Ed.2d 47 (1979), in which it is noted that:

a business enterprise has a range of choice in controlling its own corporate structure. But reciprocal obligations arise as a result of the choice it makes. The owners may take advantage of the benefits of dividing the business into separate corporate parts, but principles

Hence, courts have developed the general rule that "separate artificial corporate personalities are usually disregarded only when the corporate device is used to defraud creditors, create a monopoly, circumvent a statute or for other similar reasons." *Boggs, supra,* 590 F.2d at 662.

Typically no such "similar reasons" for piercing the corporate veil are presented in a workers' compensation case involving the issue of parent-subsidiary immunity. This is true because while almost all states provide immunity for the employer and most provide immunity for co-employees, *e.g.,* Conn.Gen.Stat.Ann. § 31–293a (1972); N.Y. Workers' Comp. Law § 29(6) (McKinney Supp.1982); N.C.Gen.Stat. § 97–9 (1982), almost all also have a strong policy of preserving the employee's rights to bring tort claims against any culpable parties who are "strangers" to the employment relationship. *See, Boggs, supra,* 590 F.2d at 659–60; *O'Brien, supra,* 475 F.Supp. at 293; 2A Larson, Workmen's Compensation Law § 72.33, at 14–179 (1982) (criticizing those courts that have committed "the cardinal sin of forgetting the pervading rule that valuable common-law rights shall not be deemed destroyed by a statute except by clear language"). With such a balance of countervailing policies on the line it is not surprising to find courts concluding that absent exceptional circumstances a parent and subsidiary will be treated as distinct legal entities when sued by the employee or his survivors, even if the parent owns all of the stock of the subsidiary, has the right to control it, and has the same directors as does the subsidiary. *See, e.g., Stoddard, supra,* 513 F.Supp. at 326; *Thomas v. Maigo,* 37 A.D.2d 754, 323 N.Y. S.2d 106 (4th Dep't 1971). "Implicit in these decisions is the suggestion that the tort system should not deny recovery in an increasingly concentrated economy to an injured employee due to the fortuitous circumstance that the tortfeasor is not a stranger but is controlled by the same business enterprise that controls his immediate employer." *Boggs, supra,* 590 F.2d at 662.

The courts of Connecticut and North Carolina seem to have reached a similar conclusion. In *Wheeler v. New York, N.H. & H.R. Co.,* 112 Conn. 510, 153 A. 159, 160 (1931), Connecticut's Supreme Court of Errors not only refused to treat as a single entity a subsidiary and a parent but also indicated that it was "in full accord" with an earlier Massachusetts holding that neither the identity of stockholders nor the parent corporation's complete control of the subsidiary "operated to create a merger of the corporations into one or make either the alter ego of the other, and that they were to be treated as distinct entities...." *Id.* In a later workers' compensation case, *Doe v. Saracyn Corp.,* 138 Conn. 69, 82 A.2d 811, 816 (1951), the same court held that a lower court had been correct in refusing to instruct the jury that the real employer was a merged entity consisting of the corporation for which the plaintiff worked and the person who maintained virtually complete control and ownership of that corporation. Reaching this conclusion despite the fact that the individual defendant managed the corporation's operations and had hired the plaintiff and paid him his wages, the court explained its conclusion as follows:

> The defendant was a legal entity with separate rights and powers conferred and duties and liabilities imposed by law. Under certain circumstances, the corporate entity may be disregarded, but the claims of proof do not warrant such action in this case. The entity will not be ignored where those in control have deliberately adopted the corporate form in order to secure its advantages.

*Id.* 82 A.2d at 816 (citations omitted).

In the one relevant North Carolina case, *Phillips v. Stowe Mills, Inc.,* 5 N.C.App. 150, 167 S.E.2d 817, 819–20 (Ct.App.1969) the court used the same rationale to deny a parent corporation the immunity accorded

of reciprocity require that courts also recognize the separate identities of the enterprises when sued by an injured employee. *See*

Fletcher, *Fairness and Utility in Tort Theory,* 85 Harv.L.Rev. 537 (1972).

its subsidiary. The court reached this conclusion after conducting a thorough examination of the facts, which resulted in the ultimate finding that the parent could not be considered as the employer. This conclusion was reached despite a finding that the parent and subsidiary "had common administrative offices, a common purchasing agent, a common personnel department and a common sales organization . . . ." *Id.* 167 S.E.2d 817 at 819. The court found that these factors were offset by the fact that "the plaintiff was performing work under the supervision and control of" the subsidiary, as well as by the fact that the two corporate entities were treated separately for all accounting and tax purposes. *Id.*

▆ The strong language of *Wheeler, Doe,* and *Phillips* suggests that for TGA to succeed with its alter ego theory,[19] it must prove a complete merger of .TG's and TGA's corporate structures, accounting and tax procedures, operational control, and business purposes. However, as was indicated earlier, some of these key characteristics of the two corporations remain at issue. Most significantly, there remains a serious question as to which of the two entities really had operational control over the flight and maintenance crews. With

such factual matters still in dispute, the Court has no choice but to submit this aspect of TGA's defense to a jury.

C. *Whether TG Was Either the Sole or Joint Employer of the Flight and Maintenance Crews Is an Issue for the Jury*

▆ TGA's second theory of immunity rests upon the premise that TG was either the sole or joint employer of the flight and maintenance crews that worked out of TGA's Westchester facilities. Assuming the validity of that premise, TGA argues, the crew members are co-employees of the plaintiffs and thus immune from tort liability under the workers' compensation laws of Connecticut, Conn.Gen.Stat.Ann. § 31–293a (1972), and North Carolina, N.C.Gen. Stat. § 97–10 (1979). In addition, TGA contends, such immunity necessarily extends to TGA because it cannot be held vicariously liable if its agents, the crew members who are alleged to have been actively negligent, are immune from suit.

The problem with this argument in the context of a motion for summary judgment is that it requires the Court to find as a matter of law that TG was the employer of the crew members; yet, such a finding is one of fact, which should be left to the

---

**19.** Reserving final decision on the technical issue of whether a Connecticut court would ever recognize the alter ego theory in the workers' compensation context, the Court proceeds on the twin assumptions that a Connecticut court would do so if the defense were raised in an exceptional case and that the instant case does present exceptional circumstances. While the reasoning in *Phillips, supra,* 167 S.E.2d at 819, indicates that North Carolina has accepted the alter ego theory as a matter of law and is willing to look at the facts of each case to determine the applicability of the theory, the general language of *Wheeler* and *Doe, see supra* pp. 886–887, taken by itself, sounds like Connecticut's outright rejection of the theory except in cases of fraud or wrongdoing. Nonetheless, other language in *Wheeler, supra,* 153 A. at 160, suggests that if a subsidiary could show "a complete identity of interests" between itself and its parent, then a Connecticut court would recognize the theory as a matter of law. This conclusion is supported, moreover, by the general conclusion of Professor Larson that the range of fact patterns from which this problem arises "is so

great that any generalization of a rule is impractical . . . .", 1C Larson's Workmen's Compensation Law § 72.40 at 14–187 (1982). Finally, it should be noted that even within a single state courts have come to opposite conclusions as to whether an alter ego defense can be rejected as a matter of law or requires careful factual analysis. *Compare, e.g., Colin v. Altman,* 39 A.D.2d 200, 202, 333 N.Y.S.2d 432, 433 (1st Dep't 1972) ("[T]he corporate veil is never pierced for the benefit of the corporation or its stockholders.") *with Daisernia, supra,* 26 A.D.2d at 595, 270 N.Y.S.2d at 543 (3d Dep't 1966) (court refused to enter judgment against defendant because it could not conclusively determine that he would be unable to establish his alter ego defense at trial). Thus, at least initially, the Court determines that the better approach is to consider this an exceptional case, because of the legalities which for a period of time compelled the separate existence of TGA, and to submit to the jury the question of whether TG and TGA were so intertwined that they should be considered as one entity for workers' compensation purposes.

jury. *See, e.g., Bradford v. Air La Carte, Inc.,* 79 A.D.2d 553, 434 N.Y.S.2d 17, 19 (1st Dep't 1980); *Lewis v. Barnhill,* 267 N.C. 457, 148 S.E.2d 536, 544 (1966); *Doe v. Saracyn Corp.,* 138 Conn. 69, 82 A.2d 811, 816 (1951). That is particularly true here, where there is conflicting evidence as to who the employer actually was. For example, while it appears that TG originally hired the crew members, carried them on its payroll, and had the right to terminate them, TGA appears to have had the right to control how they carried out their work. That right to control has consistently been held to be the most critical, if not the determinative, factor in deciding who a worker's employer is. *See, e.g., Lewis v. Barnhill,* 267 N.C. 457, 148 S.E.2d 536, 543 (1966); *Parsons v. M.J. Daly & Sons,* 114 Conn. 143, 158 A. 216, 218 (1932). Given this array of facts, it would be impossible to grant a motion based on this theory of employment. Which of the two corporate entities was the employer of the flight and maintenance crews is a matter that will have to be determined by the jury.

In denying this aspect of the motion, the Court reserves decision upon two difficult, underlying issues of law that require additional briefing. At the most technical level, the Court is uncertain whether the crew members who worked with TGA for several years can truly be viewed as having been "temporarily lent" within the meaning of Connecticut's loaned employee provision, Conn.Gen.Stat.Ann. § 31–292 (1982),[20] and also whether enactment of that provision has in any way limited the defense of joint employment under Connecticut law. At a more general level, the Court is not sure why in this particular case any immunity covering the crew members as co-employees would necessarily extend to TGA if it and TG were found to be separate entities. In other words, there is a need for further briefing on the question of whether TGA, as the alleged owner and operator of the

JetStar, has incurred any liability independent of that which it may have incurred vicariously through the acts of the flight and maintenance crews.

Finally, by leaving these legal issues unresolved, the Court does not mean to imply that TGA's theories have generally been rejected by courts. Indeed, just the opposite is true. The concepts of the loaned employee and of joint employment appear to have gained acceptance not only on a national scale, *see generally* 1C Larson, Workmen's Compensation Law §§ 48.00—48.40 (1982), but also in Connecticut and North Carolina, *see, e.g., Lewis v. Barnhill, supra,* 148 S.E.2d at 542 (loaned employee); *Leggette v. J.D. McCotter, Inc.,* 265 N.C. 617, 144 S.E.2d 849, 852 (1965) (joint employers); *De Paolo v. Cummins Diesel Engines of Connecticut,* 22 Conn.Sup. 163, 164 A.2d 301, 302 (1960) (loaned employee); *Parsons, supra,* 158 A. at 218 (loaned employee). What the Court needs to ascertain, however, is the applicability of these concepts to the particular and unusual facts of this case.

## CONCLUSION

For the reasons outlined in the discussion above, TG's and TGA's motion for summary judgment based upon the workers' compensation laws of New York, Connecticut, and North Carolina is denied, and trial of the matters discussed herein shall be scheduled as soon as the Court's trial calendar permits.

SO ORDERED.

---

**20.** That section reads:
    When the services of a worker are temporarily lent or let on hire to another person by the person with whom the worker has entered into a contract of service, the latter shall ...

be deemed to continue to be the employer of such worker while he is so lent or hired by another.
Conn.Gen.Stat.Ann. § 31–292 (1983).